UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Glen VeuCausovic,

    Plaintiff,

v.

Ford Motor Company,

    Defendant.
_____/

Case No. 11-15488

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [13]**

This employment dispute comes before the Court on Defendant Ford Motor Company ("Ford")'s motion for summary judgment. Plaintiff's single-count complaint alleges that Ford failed to reasonably accommodate his disability and thus violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*. Specifically, Plaintiff alleges that, following his transfer from Ford's Wixom plant to its AutoAlliance International ("AAI") facility in Flat Rock, Ford failed to reasonably accommodate his disability by not participating in good faith in the informal interactive process mandated under the ADA's regulations. Because Plaintiff has not offered any evidence showing a lack of good faith participation in that process on Defendant Ford's part, Ford's motion for summary judgment is GRANTED.

**I.  Facts**

    **A.  Plaintiff's Employment At Ford's Wixom Plant**

In 1989, Defendant Ford hired Plaintiff as an hourly assembly line worker at its Wixom Assembly plant. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 50-55.)

In 1993, Plaintiff had neck surgery. (*Id.* at 27-28.) After his surgery, he had a number of significant medical restrictions that prevented him from performing his job with or without reasonable accommodation.

From 1993 through 1999, Plaintiff was off work on paid leave for 69 out of 84 months because, as a result of his medical restrictions, there were no jobs available that he could perform. (*Id.* at 60-62.)

From approximately 2000 until April 2008, Plaintiff was assigned to and did perform clerical work in the Wixom plant's accounting office. (*Id.* at 63-65, 70.)

Production ceased at Ford's Wixom plan in 2007.

In March 2008, all non-skilled production workers remaining at Wixom, including Plaintiff, were given the choice of transferring to either Ford's AutoAlliance International ("AAI") plant in Flat Rock or Ford's Dearborn truck plan. This was in compliance with the terms of the Ford/UAW Collective Bargaining Agreement ("CBA"). (Def.'s Mot., Ex. 2, Smith Decl., ¶ 3.)

On March 14, 2008, Plaintiff executed a "Job Opportunities Posting Agreement" agreeing to transfer to Ford's AAI plant in Flat Rock and acknowledging his understanding that his election was irrevocable. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 71; Ex. 3, 3/14/08 Agreement.)

**B. Plaintiff's Employment at Ford's AAI Plant in Flat Rock**

Since 1989, when Defendant Ford hired Plaintiff, his job designation was that of a non-skilled production employee. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 50-55.)

From 1993 through the time of his transfer to Ford's AAI plant in 2008, Defendant Ford accommodated Plaintiff's medical restrictions by placing him on a number of paid leaves of absence and by finding him a light-duty clerical job in the Wixom plant accounting office.

Plaintiff began his employment at Ford's AAI plant by attending a week-long orientation session. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 73.) On April 7, 2008, he reported to the AAI plant's medical department. Plaintiff recalls meeting with the staff but cannot recall any communications. (*Id.*) According to AAI's medical records, Plaintiff told the AAI plant doctor that, while at the Wixom plant, he had "[s]at in room for the last 8 years to keep off comp." (Def.'s Mot., Ex. 4, Ford Occupational Health and Safety Information Management System ("OHSIM") 4/7/08 Rpt. at 1.) The report notes that restrictions were placed on Plaintiff while he was at the Wixom plant. (*Id.*) These included: (1) no repetitive overhead lifting; (2) no lifting over 15 pounds; and (3) no frequent turning head side-to-side or up-and-down. (*Id.* at 2; Ex. 1, Pl.'s Dep. at 76.) Given these restrictions, the AAI plant doctor concluded that Plaintiff was unable to perform the open AAI production jobs and thus placed Plaintiff on "no work available," "occupational" leave from April 7, 2008 through August 8, 2008. (Def.'s Mot., Ex. 4, 4/7/08 OHSIM Rpt. at 2; Ex. 5, 4/7/08 Manufacturing Pass - Health Center Communication.) Plaintiff admitted in his deposition that he understood that there were no positions available at AAI within his job restrictions in April 2008. (Def.'s Mot., Pl.'s Dep. at 77.)

**C. Ford's AAI Plant - Job Placement Efforts**

All hourly production employees at Ford's AAI plant are classified as "production team members." (Def.'s Mot., Ex. 6, Rozek Decl., ¶ 4.) All production team members are required to perform certain physical activities, i.e., walking, standing, bending, twisting,

turning squatting, reaching, lifting, pulling, pushing, squeezing, grasping, and leaning. (*Id.*) Production team members work on the assembly line and must work at the pace of the assembly line. They also stand while working their eight-hour minimum shifts, rotate from a primary job to a secondary job several times per day, and must be able to maintain a pace that allows them to do both their primary and secondary jobs without any interruption. (*Id.*)

In 2008, Ford's AAI plant had a Job Placement Committee comprised of AAI's Risk Manager; a Ford job placement coordinator; a UAW job placement coordinator; and representatives from Ford's medical, workers compensation, labor relations, and manufacturing departments. (*Id.* at ¶ 3.) The Committee's purpose was to find placement for employees with occupational medical restrictions. (*Id.*) To perform its function, the Committee followed the terms of the master and local CBA between the UAW and Ford. (*Id.*) When placing restricted employees, the Committee honored the employee's restrictions of record, considered seniority, would not create new jobs, and would not alter essential functions of existing jobs. (*Id.*)

Beginning in April 2008, the Job Placement Committee periodically reviewed Plaintiff's restrictions and determined that there were no positions available for him within those restrictions. (*Id.* at ¶ 5.) During the approximately six months that Plaintiff's name was included on the list of employees that the Committee considered for placement, the Committee was unable to locate a job that Plaintiff could perform within his restrictions. (*Id.*) At no time did Plaintiff identify a job at Ford's AAI plant that he could perform within his restrictions or request an accommodation of any kind. (*Id.*)

Plaintiff had a number of conversations with members of AAI's Job Placement Committee, including Michael Rozek, AAI's Risk Manager, and Darryl Kimbrough and Debbie Hodge, the UAW job placement coordinators, regarding the Committee's efforts to locate a job that Plaintiff could perform within his restrictions. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 94-98.) Plaintiff admits that, during the approximately six months that he was on the Job Placement Committee's list, he never identified a position that he could perform with his restrictions. (*Id.* at 99.)

### D. Plaintiff's September 2008 IME

In September 2008, Ford sent Plaintiff to have an independent medical evaluation ("IME") with Dr. Scott Monson in connection with a Worker's Compensation claim that Plaintiff had filed. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 86; Ex. 7, Dr. Monson's 9/30/08 Rpt. at 1-2.) After examining Plaintiff, Dr. Monson concluded that Plaintiff's 1993 neck surgery had been successful, that Plaintiff had no remaining symptoms from the surgery, but that he had "significant arthritic changes throughout his cervical spine" that are "degenerative in origin" and unrelated "to his place of employment." (Def.'s Mot., Ex. 7, Dr. Monson's 9/30/08 Rpt. at 3-4.) Dr. Monson concluded that, because Plaintiff's "symptoms may be increased when he is active with the degree of degenerative disease that he has in his neck," he "can work but restrictions to heavy lifting over 15 to 20 pounds would be appropriate and he should change positions as needed." (*Id.*) Accordingly, the cause of Plaintiff's restrictions was changed from "occupational" to "personal" and his restrictions were modified to: (1) no lifting over 15 to 20 pounds, and "may need to change positions as needed." (Def.'s Mot., Ex. 8, AAI "Restricted Job Placement Referral.")

5

Plaintiff testified that, although he disagreed with Dr. Monson's medical conclusions, he did not have the UAW file a formal grievance on his behalf challenging the IME. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 86-88, 90, 102-03.) Plaintiff testified that he "tried to keep the issue 'in-house' as much as possible," allowing the UAW to handle the issue more informally. (*Id.* at 90, 102-103.)

The Job Placement Committee honors an employee's medical restrictions of record when considering job placements. If an employee disagrees with a particular restriction, it is the employee's responsibility to work through Ford's medical and workers compensation departments to re-evaluate the restriction. Restrictions assigned through an IME are final and binding on Ford and the UAW according to the terms of their CBA. (Def.'s Mot., Ex. 6, Rozak Decl., ¶ 3.)

The AAI plant's Job Placement Committee made efforts for more than six months to place Plaintiff in a position at that Ford plant within his restrictions but was unable to do so. (Def.'s Mot., Ex. 6, Rozek Decl., ¶ 5.) Even after Plaintiff's restrictions were reclassified from "occupational" to "personal" in September 2008, Plaintiff continued to talk with members of the Committee regarding possible placement. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 89, 99-102; Ex. 6, Rozek Decl., ¶ 6.) He testified that he had numerous communications with the UAW job placement coordinator, Darryl Kimbrough, who told Plaintiff that he could not be assigned to a position at Ford's AAI plant due to his medical restrictions. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 99-103, 163-64.)

### E. Plaintiff Requests Transfer to Different Ford Facility - June 2009

In June 2009, due to continuing deteriorating marketing conditions and a significant surplus of UAW-Ford hourly employees, Ford decided to replace Visteon temporary

6

employees, who were working at former Visteon facilities now owned by Ford, with Ford hourly employees. Two of the facilities that were accepting these temporary loans were the Saline and Sheldon Road facilities. The process for implementing these loans was collectively bargained between Ford and the UAW. Pursuant to that process, Ford posted for volunteers at its facilities in Southeast Michigan. Ford employees eligible to sign up for the temporary loans to the Saline and Sheldon Road facilities included laid-off and active Ford employees. The only inactive employees who were eligible to sign up for the loans were employees who were on indefinite layoff. Employees off the rolls or on inactive status due to other circumstances were not eligible to be considered for the temporary loan opportunity. Durinda Smith, Manager of Employment Security Programs in Ford's Labor Affairs office, would remove the names of ineligible employees who signed the posting agreement "to ensure that only those employees eligible to transfer pursuant to the collectively bargained agreement were permitted to do so." (Def.'s Mot., Ex. 2, Smith Decl., ¶¶ 4-5.)

Typically, non-skilled new hires or assemblers new to Ford's Sheldon Road facility are placed on the HVAC assembly line where the assembler is required to keep up with the pace of the assembly line. Assemblers on the line may rotate work stations up to one or two times per shift, but perform the same job for a minimum of several hours at a time and do not have the flexibility to sit or stand as needed. (Def.'s Mot., Ex. 13, Rastigue Decl., ¶ 3.)

On June 23, 2009, Plaintiff requested to transfer into one of the temporary jobs at the Sheldon Road facility by filling out a form and submitting it to the Labor Relations office at Ford's AAI plant. (Def.'s Mot., Ex. 11, 6/23/09 Long-Term Temporary Job Opportunity

Posting Agreement; Ex. 1, Pl.'s Dep. at 141-42.) He did so despite language in the notifying Bulletin that these long-term temporary job opportunities were available "to eligible non-skilled hourly employees," and defining "eligible employees" as "Laid off employees (ILO and TLO) and actively working employees." (Def.'s Mot., Ex. 12, Bulletin, Available Long-Term Temporary Job Opportunities (Non-Skilled); Ex. 2, Smith Decl., ¶¶ 4-5.)

Plaintiff testified that he has no reason to believe that either Defendant Ford or the UAW failed to follow the collectively bargained process governing these transfer opportunities. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 144.)

Plaintiff admitted in his deposition that, beyond speculating, he could not identify a position at the Sheldon Road facility that he could perform within his restrictions, either with or without accommodation. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 145-48.)

### F. Plaintiff's October 2009 IME

In October 2009, Defendant Ford sent Plaintiff for another IME. Although Plaintiff had withdrawn his earlier Workers' Compensation claim, he resubmitted it, and this is what triggered the October 2009 IME. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 155-56.)

After examining Plaintiff on October 27, 2009, Dr. Monson observed that he previously examined Plaintiff in September 2008 and concluded that:

> Again, this gentleman is found to be the same as he was the first time. He does require restrictions following his neck surgery and I feel they are appropriate. He can work within those restrictions of no heavy lifting over 15 - 20 pounds and change positions as needed. I think most of his symptoms, when he has them, specifically the aching pain that he has from time to time, is degenerative in origin. Once again, home exercise would be appropriate.

(Def.'s Mot., Ex. 9, Dr. Monson 10/27/09 Rpt. at 3.) Plaintiff disagreed with Dr. Monson's conclusions, specifically the "change positions as needed" restriction. He contacted the

8

AAI plant's Medical Department requesting more specificity. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 156-57.)

On November 12, 2009, Dr. Monson supplemented his Report, clarifying the "change positions as need" restriction to specify that Plaintiff "should not sit or stand in one position more than 15-20 minutes at a time." (Def.'s Mot., Ex. 10, Dr. Monson 11/12/08 Rpt. at 1.) Although Plaintiff disagreed with Dr. Monson's medical conclusions, he again decided against filing a grievance challenging the IME. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 156-159.) Ford revised Plaintiff's medical restrictions to reflect Dr. Monson's medical conclusions. (*Id.* at 148; Pl.'s Dep. Ex. 19, 11/18/09 "Manufacturing Pass - Health Center Communication.")

### G. Plaintiff's Second Transfer Request - June 2010

On June 10, 2010, Plaintiff again applied for a transfer to the Sheldon Road or Saline facilities. (Def.'s Mot., Ex. 14, 6/10/10 Job Opportunities Posting Agreement; Ex. 1, Pl.'s Dep. at 164-66; Ex. 2, Smith Decl., ¶ 5.) At that time, Plaintiff's restrictions were (1) no lifting over 15 to 20 pounds, and (2) no sitting or standing in one position more than 15 to 20 minutes. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 172-175.) Plaintiff admits that he could not identify a specific position at the Sheldon Road or Saline facilities that he could perform within his specifications either with or without an accommodation. (*Id.*) He also admitted that he was aware that the transfer process was a collectively bargained process. (*Id.* at 172.)

### H. Plaintiff Applied For and Then Retired - June 1, 2011

Pursuant to Ford's disability retirement plan, Plaintiff applied for and then retired effective June 1, 2011. (Def.'s Mot, Ex. 1, Pl.'s Dep. at 192-93.)

9

### I. Plaintiff's Lawsuit

Plaintiff filed this lawsuit, alleging a single ADA claim, on December 15, 2011. This matter is now before the Court on Defendant's motion for summary judgment.

### II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

### III. Analysis

As provided in the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA's definition of "discriminate" includes "the failure to provide reasonable accommodation to an otherwise qualified individual with a disability, unless doing so would impose an undue hardship on the employer's business." *Keith v. Cnty. of Oakland*, ___ F.3d ___, 2013 WL 115647, at *5 (6th Cir. Jan. 10, 2013) (citing 42 U.S.C. § 12112(b)(5)).

"To establish a prima facie case, a plaintiff must show that he is disabled or otherwise qualified for the position, either with or without reasonable accommodation." *Id.* "Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to show that accommodating the plaintiff would impose an undue hardship on the operation of its business." *Id.*

For its motion, Defendant Ford does not dispute that Plaintiff is disabled within the meaning of the ADA. At issue here is whether Defendant Ford failed to reasonably accommodate Plaintiff's disability. More specifically, the disputed issue here is whether Defendant Ford failed to engage, in good faith, in the informal, interactive process designed to identify reasonable accommodations for a disabled employee as mandated under the ADA's regulations. "The duty to engage in the interactive process with a disabled employee is mandatory and 'requires communication and good-faith exploration of possible accommodations.'" *Id.* at *11 (quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007), and citing 29 C.F.R. § 1630.2(o)(3)). As the Sixth Circuit observed in *Kleiber*, "[t]he purpose of this process is to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Kleiber*, 485 F.3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)). Defendant Ford argues that it did communicate with Plaintiff and make a good faith effort to identify his precise limitations and potential reasonable accommodations that could overcome those limitations. This Court agrees with Defendant Ford.

That Defendant Ford accommodated Plaintiff while he was as its Wixom plant by first placing him on a number of paid leaves of absence and then finding a light-duty clerical job for him in its accounting office, which he held for eight years, does nothing to establish Plaintiff's current ADA claim. "While an employer should show patience when an employee first falls sick, if an employer 'bends over backwards to accommodate a disabled worker . . . it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.'" *Amadio v. Ford Motor Co.*, 238

F.3d 919, 929 (7th Cir. 2001) (quoting *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995)). An employer that "goes further than the law requires" does not have to continue to do so or risk violating the ADA. *Vande Zande*, 44 F.3d at 545.

"[T]o overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." *Kleiber*, 485 F.3d at 870. *See also Willard v. Potter*, 264 F. App'x 485, 487 (6th Cir. 2008) (observing that "where the plaintiff claims that she should have been accommodated by reassignment to another position, identifying the necessary accommodation requires the plaintiff to identify the position to which she should have been reassigned."). Plaintiff has not done that here.

Plaintiff admitted in his deposition that, at the time of his April 2008 transfer to Ford's AAI plant, there were no positions available there that he was capable of performing within his job restrictions, with or without accommodation. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 77, 99, 102.) He also testified, however, that he had conversions with a union representative, Mr. Marfal, and Darryl Kimbrough, a UAW Job Placement Coordinator on AAI's Job Placement Committee, about two other employees who had medical restrictions yet found positions at Ford's AAI plant after being transferred from the Wixom plant at the same time as Plaintiff -- hourly employees Todd Clark and Chris Ketchum. As to Todd Clark, Plaintiff testified that he thought Todd had a knee problem or limited use of one leg, but admitted he had no knowledge about his medical restrictions, his medical history, or what job he ultimately got at the AAI plant. (*Id.* at 116-121.) As to Chris Ketchum, Plaintiff testified that he thought Mr. Ketchum had limited use of his right arm. He also testified that he had no knowledge about Mr. Ketchum's medical restrictions, medical history, what job he ultimately

13

got at the AAI plant, or what the physical requirements of that job could be. (*Id.* at 120-23.) Without any evidence as to these key facts, Plaintiff cannot show that these two Ford employees were similarly situated to him yet treated more favorably under similar circumstances or that there were jobs at AAI that he could have performed within his medical restrictions with or without accommodation. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (holding that "comparables should be similarly situated in all relevant respects").

Despite his claim that he was entitled to transfer from Ford's AAI plant to a temporary position at Ford's Sheldon Road or Saline facilities, Plaintiff admitted in his deposition that, beyond speculation, he could not identify a position at either of those facilities that he could perform within his restrictions, either with or without accommodation. (*Id.* at 145-48, 172-75.) He presents no evidence of an available position at either the Sheldon Road or Saline facilities for which he was qualified and could perform either with or without accommodation. Plaintiff, who took no discovery on this or any other topic, merely conjectures that there were such jobs. This is insufficient to defeat a motion for summary judgment. *See* Fed. R. Civ. P. 56(c). Moreover, Plaintiff testified that he was aware that the posting and job placement process involved in these requested transfers were governed by the Collective Bargaining Agreement between Ford and the UAW. He admitted that he had no reason to believe that Ford or the UAW failed to follow their collectively bargained process with respect to transfer opportunities. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 144.)

As to Plaintiff's failure-to-accommodate claim, the ADA does not require an employer to create a new job or displace existing employees to accommodate a disabled employee. *See Kleiber*, 485 F.3d at 869 (observing that, while "'an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified,'" that duty "does not require employers 'to create new jobs [or] displace existing employees from their positions . . . in order to accommodate a disabled individual.'" *Id.* (quoting *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000)).

As to Plaintiff's claim that he should have been accommodated by a transfer to either the Sheldon Road or Saline facilities, the undisputed evidence shows that he was not eligible to do so under the terms of the Ford/UAW collectively bargained transfer process. (Def.'s Mot., Ex. 2, Smith Decl., ¶ 5.) The ADA does not require an employer to "violate other employees' rights under a collective bargaining agreement or other non-discriminatory policy in order to accommodate a disabled individual." *Burns*, 222 F.3d at 257. The temporary transfer opportunities were expressly limited to employees on layoff status or active employees. (Def.'s Mot., Ex. 2, Smith Decl., ¶ 5.) When both of the transfer opportunities at issue arose, Plaintiff had not been on a paid leave for longer than 90 days and was thus an inactive employee. Here, Defendant Ford was not required to violate its collectively bargained transfer process with the UAW, and Plaintiff's failure-to-accommodate-by-transfer claims fail. Plaintiff's failure-to-participate claim likewise fails.

Like the plaintiff in *Kleiber*, Plaintiff argues here that he was "unable to identify a particular suitable position" at Ford's AAI plant, or at the Sheldon Road or Saline facilities

15

where he also sought transfers, because Defendant Ford "did not participate in good faith in the 'interactive process.'" *Kleiber*, 485 F.3d at 871. This Court disagrees.

Plaintiff offers no evidence to support his failure-to-participate argument. As stated above, the concept of an interactive process derives not from the ADA, but from one of its regulations. *See* 29 C.F.R. § 1630.2(o)(3). As stated in that regulation, "[t]o determine the appropriate reasonable accommodation [for a given employee], it may be necessary for the employer to initiate an informal, interactive process with the [employee]." *Id.* The goal of that informal, interactive process is to "identify the precise limitations resulting from the [employee's] disability and potential reasonable accommodations that could overcome those limitations." *Id.* Contrary to Plaintiff's arguments here, the record evidence shows that Defendant Ford did participate in the interactive process in good faith.

In April 2008, immediately upon Plaintiff's transfer from Ford's Wixom plant to its AAI plant, the plant's medical staff met with Plaintiff to review and discuss his medical history and restrictions. (Def.'s Mot., Ex. 4, 4/7/08 Med. Rpt.) Plaintiff informed the AAI medical staff that, while at Wixom, he had "[s]at in a room for the last 8 years to keep off comp." (*Id.* at 1.) AAI's plant doctor reviewed Plaintiff's medical restrictions, which at that time were: (1) no repetitive overhead lifting; (2) no lifting over 15 pounds; and (3) no frequent turning of the head from side-to-side or up-and-down. (*Id.* at 2.) The AAI plant doctor concluded that, given those restrictions, Plaintiff was not capable of performing the open AAI production jobs, which were on the assembly line and required a range of physical activities, including lifting and turning of the head. (*Id.*; Ex. 6, Rozek Decl., ¶ 4.)

16

Because there were no open AAI jobs within Plaintiff's medical restrictions, Plaintiff was placed on a paid, "no work available" leave. (Def.'s Mot., Ex. 4, 4/7/08 Med. Rpt. at 2.) While Plaintiff was out on paid leave, AAI's Job Placement Committee periodically reviewed his restrictions and attempted to find placement at AAI for him within those restrictions. (Def.'s Mot., Ex. 6, Rozek Decl., ¶ 5.) Plaintiff himself testified that he had conversations with members of AAI's Job Placement Committee, including (1) Michael Rozak, AAI's Risk Manager; (2) Darryl Kimbrough, a UAW Job Placement Coordinator; and (3) Debbie Hodge, another UAW Job Placement Coordinator. Each of these conversations concerned the Committee's efforts to locate a job at AAI that Plaintiff could perform within his restrictions. (Def.'s Mot., Ex. 1, Pl.'s Dep. at 94-98.)

Plaintiff's discussions with members of AAI's Job Placement Committee continued even after his medical restrictions were modified under the collectively bargained IME process to include the restrictions: "may need to change positions as needed" and "should not sit or stand in one position for more than 15-20 minutes at a time." (*Id.* at 99-102, 163-64; Ex. 10, Dr. Monson's 11/12/09 Rpt.) Plaintiff's deposition and other record evidence reveals that Defendant Ford interacted with Plaintiff through its AAI plant medical staff, the Job Placement Committee members, and the IME process. These interactions helped identify Plaintiff's precise medical limitations. They reveal Defendant Ford's good faith efforts to reasonably accommodate Plaintiff's disability by locating an open AAI position that he could perform without exceeding his medical restrictions. Plaintiff presents no evidence to the contrary.

## IV. Conclusion

For the above-stated reasons, Defendant's motion for summary judgment is GRANTED.


        s/Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated: January 28, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 28, 2013, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager